## HAWKEYE CASUALTY CO. v. WESTERN UNDERWRITER'S ASS'N, Inc., et al.

### No. 2209.

District Court, D. Idaho, S. D.

Jan. 8, 1944.

Elam & Burke, of Boise, Idaho, for plaintiff.

Vernon K. Smith and Hawley & Hawley, all of Boise, Idaho, for defendants.

Jas. W. Galloway, of Boise, Idaho, for Pacific Finance Co.

CLARK, District Judge.

This action is brought under the Declaratory Judgment Act of Congress of June 14, 1934, as amended August 30, 1935, Sec. 405, Section 400, 28 U.S.C.A. Judgment is prayed for adjudging the rights, status and other legal relations of the plaintiff under the terms of an automobile liability insurance policy (herein particularly described) issued to one of the defendants herein, B. J. Borresen, covering a 1940 Lincoln Zephyr Sedan.

The Hawkeye Casualty Company is a corporation organized and existing under and by virtue of the laws of the State of Iowa and is a citizen of that state.

The defendant Western Underwriter's Association Inc., is an Idaho corporation with its principal place of business at Boise, Idaho, hereinafter called Western Underwriters, and the defendant Pacific Finance Corporation, hereinafter called Pacific Finance, is a corporation of the State of Delaware, with its office and principal place of business at San Francisco, California. Tyrus C. Hurtt, Frank Sandner, Loaine Morrow, Jacqueline Dresser and B. J. Borresen are all residents and citizens of the State and District of Idaho, and in the Southern Division thereof, they will be hereafter referred to only by their last names.

The facts fairly deducible from the evidence are as follows:

The plaintiff, on the 12th day of May 1942, issued and delivered to the office of the Western Underwriters, an automobile liability insurance policy covering a 1940 Lincoln Zephyr Four Door Sedan, for a period of three months from said date, the policy being issued at the request of the Western Underwriters, in the name of Borresen, the plaintiff being advised that he was the owner of the car.

That part of the policy with which the court is concerned in this case provides as follows:

"Warranties.

"Item 1. Name of Insured B. J. Borresen".

"Item VI. Is the named insured the sole owner of the automobile, except as shown in the mortgage schedule at Item IV Yes

"This policy is issued by the Company relying upon the truth of the above warranties and shall not be valid unless countersigned by a duly authorized representative of the Company.

"Countersigned this 13th day of May 1942, at Boise, Idaho. Willis H. Coffin, authorized representative

"Hawkeye Casualty Company. A Stock Insurance Company, herein called the Company

"Does hereby agree with the Insured, named in the warranties made a part hereof, in consideration of the payment of the premiums and of the statements contained in the warranties, which statements the Insured makes and warrants to be true, and subject to the limits of liability, exclusions, conditions and other terms of this policy:

"Section I. Damage By the Automobile—Coverage A. Bodily Injury Liability. To Pay on behalf of the insured all sums

which the Insured shall become obligated to pay by reason of the liability imposed upon him by law for damages, including damages for care and loss of services, because of bodily injury, including death at any time resulting therefrom, sustained by any person or persons, caused by accident and arising out of the ownership, maintenance or use of the automobile * * *

"Defense, Interest, Cost and Medical Aid. In Addition To The Above The Company Does Hereby Agree: (a) To Provide in the Insured's name and behalf a defense to any suit against him, alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent, but the Company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the Company; (b) To Pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of Liability of this policy, all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish such bonds, all costs taxed against the Insured in any such suit, all expenses incurred by the Company, all interest accruing after entry of judgment until the Company has paid, tendered or deposited in court such part of such judgment as does not exceed the limit of the Company's liability thereon, and any expense incurred by the Insured in the event of bodily injury for such immediate medical and surgical relief to others as shall be imperative at the time of accident.

"Definition of 'Insured'. The unqualified word 'Insured' wherever used in coverages 'A' and 'B' and in other parts of this policy, when applicable to these coverages, includes not only the Named Insured but also any person while using the automobile and any person or organization legally responsible for the use thereof, provided that the declared and actual use of the automobile is 'pleasure' or 'pleasure and business' or 'business' or 'Commercial,' each as defined herein, and provided further that the actual use is with the permission of the Named Insured. The provisions of this paragraph do not apply: (a) to any person or organization with respect to any loss against which he has other valid and collectible insurance; (b) to any person or organization, with respect to bodily injury to or death of any person who is named insured; (c) to any person or organization, or

to any agent or employee thereof, operating an automobile repair shop, public garage, sales agency, service station or public parking place, with respect to any accident arising out of the operation thereof; (d) to any employee of an insured with respect to any action brought against said employee because of bodily injury to or death of another employee of the same insured injured in the course of such employment in an accident arising out of the maintenance or use of the automobile in the business of such insured.

"Section II. Damage to the Automobile "Coverage F Collision or Upset.

"To Pay For any direct loss or damage to the automobile caused by accidental collision or upset, where the damages to the automobile herein described from such collision or upset is in excess of the deduction specified in Item 3 of the Warranties; each accident shall be deemed a separate claim and the amount of determined loss or damage shall be subject to such deduction; but this insurance shall not cover loss or damage: (1) caused directly or indirectly by fire; (2) to any tire unless caused in an accidental collision or upset which also causes other loss or damage to the automobile.

"Conditions, Limitations and Agreements.

"This Policy Does Not Apply:

"*. * * (b) Under Section I and Paragraphs F and G, of Section II, while the automobile is operated by any person under the age of fourteen years, or by any person in violation of any state, Federal or provincial law as to age applicable to such person or to his occupation, or by any person in any prearranged race or competitive speed test; * * *

"(d) under Section I, to any liability assumed by the Insured under any contract or agreement; or to any accident which occurs after the transfer during the policy period of the interest of the named insured in the automobile, without the written consent of the Company;

"E Title and Ownership.

"This policy shall be void or shall immediately terminate, as respects loss or damage to any property insured hereunder, if the interest of the Insured in the subject of this insurance be or become other than unconditional and sole ownership, or if the subject of this insurance has ever been stolen or unlawfully taken and not returned

to the lawful owner prior to the issuance of this policy.

"P Misrepresentation and Fraud

"This entire policy shall be void if the Insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof; or in case of any fraud, attempted fraud, or false swearing by the Insured touching any matters relating to this issuance or the subject thereof, whether before or after a loss or accident.

"This policy is issued and accepted subject to the conditions, limitations, agreements and warranties set forth herein or endorsed hereon, and upon acceptance of this policy the insured agrees that its terms embody all agreements then existing between himself and the company or any of its agents relating to the insurance described herein, and no officer, agent or other representative of the Company shall have power to waive any of the terms of this policy unless such waiver be written upon or attached hereto, and signed by a duly authorized agent of this Company, nor shall the knowledge possessed by any agent or by other person, be held to effect a waiver or change in any part of this contract. This policy shall be void in event of violation by the Insured of any agreement, condition or breach of any warranty contained herein or in any rider now or hereafter attached hereto."

The ownership of the car at the date the policy was issued and the ownership on the date of the accident are controverted and their legal consequences are disputed, but from the evidence it can be safely said that at the time the policy was issued to Borresen, the conditional title to the car was in the name of the defendant, Western Underwriters.

The car was purchased from the Union Motor Company of Twin Falls, Idaho, under a contract of conditional sale with payment down of four hundred dollars, the balance to be paid in eighteen months at $46.63 per month. The contract was dated December 30, 1941, and was signed by the Union Motor Company as seller and Western Underwriters Ass'n by Borge John Borresen, as purchaser (exhibit 9). The registered title being held in the name of Union Motor Company, the seller, this title was assigned to Western Underwriters, Borge Julin Borresen, with lien in favor of Pacific Finance (exhibit 5); registered title was issued to Western Underwriters,

with the Pacific Finance as lien holder January 6, 1942, (exhibit 6).

Insurance was applied for by Hurtt and issued on the car in the name of B. J. Borresen on the 4th day of January 1942 with the Associated Fire and Marine Insurance Co., this was later cancelled and on May 12, 1942, application was made to plaintiff herein and the policy hereinbefore mentioned was issued to Borresen.

The title of the car was never at any time in the name of Borresen. Borresen purchased the car in the name of Western Underwriters; the payment down and all deferred payments on the car were made by the Western Underwriters. The payment down on the contract of purchase was made with stock in the Western Underwriters. It was carried at all times as an asset of the Western Underwriters. Defendant Hurtt caused the insurance to issue and paid the premium with Western Underwriters funds; plaintiff had no knowledge that Western Underwriters was the owner of the car. The car was used for the business of the Western Underwriters.

Borresen never did see the policy. The application was made by Hurtt and the policy was delivered at the office. The car was placed in Borresen's care, he used it on company business. Later Borresen was expecting to leave for Army service and he talked to one Bacon, a director of Western Underwriters, at a dinner party at his residence one evening about taking the car at the cost price as shown by the company's books and applying the amount owing to him for commissions earned, on the purchase price. (This was after the insurance policy had been written in Borresen's name.) This proposed deal was never passed upon as far as the records of the Western Underwriters show and the Secretary of the Western Underwriters never heard of the proposed deal, nor was the plaintiff advised of it. This agreement was cancelled some time prior to the date of the accident, and at that time Borresen ceased working for the Western Underwriters and surrendered possession of the car. A few days later he again took the car to take care of some unfinished business for the Western Underwriters.

On June 6, 1942, Borresen made a trip in the car in question to Lewiston, Idaho, on business for the Western Underwriters, and took with him defendants Hurtt and Sandner. Hurtt's purpose in taking the

trip was to meet stockholders of the Western Underwriters at Lewiston; Sandner being employed to go along to assist in driving, it being a hard drive for the day. Sandner had no connection with the Western Underwriters. Sandner drove the last thirty miles returning to Boise and upon arriving at Boise, about midnight, drove to a drive-in sandwich place known as the Comet, where Sandner worked, so that Sandner could get the cash, as it was his duty to open the place in the morning. While Sandner was getting the cash it was agreed that two girls working there would ride home with Sandner, Borresen and Hurtt. It was understood that Sandner, having taken the cash, would go directly home. Sandner drove first to Borresen's residence and when Borresen got out of the car he (Borresen) told Sandner to take the girls home and to take Hurtt home and that he (Borresen) would pick the car up at Sandner's place or the drive-in sandwich place, the next morning.

There is no conflict in the evidence as to the permission given Sandner to take the girls, Morrow and Dresser, home as shown by the testimony of Borresen, Hurtt, Sandner, Morrow and Dresser. Borresen testified:

"Q. Now, Frank Sandner was driving when you got into Boise? A. That's right.

"Q. What happened then, Lieutenant? A. Frank had to go to report to this drive-in because he opened the place up every morning.

"Q. What is the name of it? A. The Comet.

"Q. He had to open that up the next morning? A. Yes and he had to get the money bags.

"Q. What time did it close Saturday night? A. They close at twelve o'clock then they clean the place up.

"Q. When you got there what occurred? A. Frank went in to get the money to open up with and the owner of the place asked me if I was going right straight home and I told him, Yes absolutely and he said, I don't want to give this money to Frank unless he is going straight home. I said, we are all heading for home and he said if he is not going home I would not give it to him.

* * * * *

"Q. Where did you go after that? A. They took me right straight home.

"Q. Then, what was to happen to your automobile? A. I told Frank, I said, as long as these kids are with you take them home and take Ty home.

* * * * *

"Q. State whether or not you had given Frank Sandner or any one else permission to take the car out of Boise on this night? A. No sir.

"Q. Had you given Frank Sandner or any one permission to let anyone other than Frank Sandner drive the automobile? A. No."

Sandner testified:

"Q. What was the purpose in going to the Comet? A. I had to have the change in the morning to open up the place.

"Q. They were just closing up at the time you arrived at the Comet? A. That's right.

* * * * *

"Q. It is a fact that the manager of the place was going to take all these employees home in his car and you drove up and you suggested that you take two? A. Sometimes he took them.

"Q. It was what happened that evening? A. I suggested that I take two as his car was full.

"Q. And then you were going to take them home? A. Yes sir.

"Q. The two girls were to get in your car and you were to take them home? A. Yes.

* * * * *

"Q. Where did you go when you left him,—when you let him out? A. From there we drove back to the Comet.

"Q. Why? A. We wasn't sure what we were going to do that evening when we let him out and I had the money and I didn't want to carry it around and I took it back.

"Q. Back where? A. To where we got it, to the place,—the Comet.

"Q. Where did you put the money? A. In one of the beer coolers."

Morrow testified:

"Q. As I understand it, these men drove to the Comet about the time you were ready to go home? A. Yes sir.

"Q. You were looking for someone to take you home? A. Yes sir.

"Q. It was understood that they were to take you home when you left there? A. Yes sir."

Dresser testified:

"Q. How were you going home that night? A. We were going to take a taxi because Ross' car was full.

"Q. Under what circumstances did you get in that car? A. It was the car that Frank was to take us home in.

"Q. I didn't get that answer. A. Frank was going to take us home."

At the time Morrow and Dresser entered the car it was the intention of all parties that they were going home. Ross Haworth, the owner of the drive-in testified:

"Q. Did you have any conversation about the change that night? A. I asked if he was going home, if he was that I would give him the change, and he said yes, he was.

"Q. You did give him the money? A. Yes sir.

"Q. Was that a substantial amount of money? A. Yes, as I recall, about seventy five dollars.

"Q. Did you have a conversation with Jack Borresen? A. Yes sir. He was standing there and I asked if he was going home and he assured me they were going home.

\*　　\*　　\*　　\*　　\*

"Q. What was the conversation you had about where they were going? A. They were standing inside by the bar and I had the money in a sack and I was giving it to Frank and I asked if he was going home and he said yes they were going home. I turned to Jack and asked if they were going home and he said yes they were going home."

After Sandner, Hurtt, Morrow and Dresser left Borresen's home in the car, and after driving around Boise for a short time, Morrow suggested that she would like to go to Glenns Ferry, a town some seventy-five miles from Boise. After some discussion it was agreed between Hurtt, Sandner, Morrow and Dresser that they would go to Glenns Ferry. They then went to the drive-in and Sandner left the cash that he had taken at closing time that evening, to take home with him. They stopped and drank some beer and later they made a stop at a night club and purchased some liquor. (There was no evidence that they drank any of it.) They then proceeded to Glenns Ferry and on the way back, Sandner and Dresser were riding in the front seat and Hurtt and Morrow in the rear seat. Sandner was driving until some distance from Boise when Dresser suggested that she would drive and give Sandner a rest. Sandner had previously asked Hurtt's advice as to Dresser driving and Hurtt agreed that she could drive. Dresser was under sixteen years of age and was inexperienced in driving. Sandner went to sleep and Dresser, while driving the car at about ninety miles an hour, lost control of the car; it upset and all parties were injured.

Following the accident Morrow filed suit against Sandner and Dresser, and Hurtt filed suit against Sandner and Dresser, both actions seeking to recover damages and both suits being filed in the District Court of the Third Judicial District of the State of Idaho, and claiming that the plaintiff is liable for any judgment they may secure in said actions and that it is plaintiff's duty to appear and defend said suits.

There are three main questions for the court to pass upon in determining the liability of the plaintiff, submitted in the briefs in the following order:

1. Was Sandner insured under the terms of the policy?

2. Was there a liability under the policy, arising out of the accident, for the reason that at the time and place of the said accident the car was driven by a minor in violation of the laws of the State of Idaho, applicable to such minor?

3. Was Borresen insured under the policy by reason of the fact that he was not the sole and unconditional owner of the car, and by reason of the fact that he had no interest in the car, either at the time the insurance was issued, or at the time of the accident?

Under the first question we find Borresen, Hurtt and Sandner leaving the drive-in hereinbefore mentioned with the purpose in mind of taking Morrow and Dresser home. They first dropped Borresen off at his home, leaving his place with Sandner at the wheel, to take the girls home. Borresen was going to use the car the following day and he advised Sandner to take the girls home and that he (Borresen) would pick the car up, either at Sandner's residence or the Comet,—which was the drive-in,—on the following morning. There was no evidence that any other trip was contemplated with the car, and there was nothing to suggest or impart knowledge to Borresen that the trip to Glenns Ferry was contemplated. The evidence heretofore re-

cited would be to the contrary. Sandner had the cash from the Comet; he had promised the owner in the presence of all of the parties, that they would go straight home. It is clear, from the evidence, that the trip to Glenns Ferry was agreed upon by Sandner, Hurtt, Dresser and Morrow, after leaving Borresen's residence. The permission to use the car, so far as Borresen was concerned, was only for the purpose of taking the two girls home. The instruction from Borresen was limited; the use to which the car was to be put was specific and clear. It is not reasonable to contend that it was necessary for Borresen to have recited the things Sandner would be prohibited from doing, in order to give this specific permission.

■ Some courts have adopted the theory that an operator of a car having been permitted the use in the first instance, that every act of the permittee thereafter, regardless of whether the acts were within the scope of the original consent, was to be construed to be with the permission of the named insured; we find that the rule adopted by this circuit is otherwise. This question has been definitely settled in two cases by the Circuit Court of Appeals of this, the Ninth Circuit, and these decisions seem to be in conformity with the majority rule; that express permission for a given purpose does not imply permission for all other purposes and that the actual use must be within the consent of the named assured. Frederiksen v. Employers' Liability Assur. Corp. Ltd., 26 F.2d 76. Trotter v. Union Indemnity Co., 35 F.2d 104.

■■ The authorities are uniform that an insurance contract is to be construed most favorably to the insured, and that no strict technical interpretation of the contract should be made, however, the provisions of this policy are not ambiguous and the clause is not susceptible to two different constructions where the policy provides that "the actual use is with the permission of the named insured." This clause was a known part of the stipulations of the policy. It should receive a fair and reasonable interpretation according to its terms and obvious import.

"The insured has no right to complain, for he assents to comply with all the stipulations on his side, in order 'to entitle himself to the benefit of the contract, which, upon reason or principle, he has no right to ask the court to dispense with the performance of his own part of the agreement, and yet to bind the other party to obligations, which, but for those stipulations, would not have been entered into." Carpenter v. Providence Washington Insurance Co., 16 Pet. 495, 41 U.S. 495, at page 511, 10 L.Ed. 1044.

■ Sandner was not using the car within the scope of the permission granted him. Under no stretch of the imagination could it be said that it was agreed or understood and contemplated that Sandner would go on a more or less joy-ride outside the city a distance of 75 miles (150 miles round trip), nor could it be said that it was agreed, understood or contemplated that Sandner would turn the driving of the car over to a girl inexperienced in driving, under 16 years of age, and prohibited by the laws of the State from driving a car. Such action on the part of Sandner or Hurtt could not have been contemplated by Borresen, and not having been consented to by him, the protection of the policy is not extended to Sandner or Hurtt or their guests.

■ As to the second question; the evidence shows that Sandner permitted a minor, Dresser, to drive the car. This was a violation of the laws of the State of Idaho, in that it is conceded that the defendant Dresser was under the age of 16 years, without a driver's license and the evidence clearly establishes that the accident happened before sunrise on the morning in question.

The Idaho Uniform Motor Vehicle Operators' and Chauffeurs' License Act, Chapter 88, Idaho Session Laws 1935, Section 7(a) provides as follows: "No person, except those hereinafter expressly exempted shall drive any motor vehicle upon a highway in this state unless such person has a valid license as an operator or chauffeur under the provisions of this Act. No person shall operate a motor vehicle as a chauffeur unless he holds a valid chauffeur's license."

Section 9 provides in part as follows:

"The department shall not issue any license hereunder:

"1. To any person, as an operator, who is under the age of 16 years, except that the department may issue a restricted license as hereinafter provided to any person who is at least 14 years of age."

Section 13, subdivisions (a) and (b) provide:

"(a) The application of any person under the age of 18 years for an instruction permit or operator's license shall be signed and verified before a person authorized to administer oaths by both the father and mother of the applicant, if both are living and have custody of him or in the event neither parent is living then by the person or guardian having such custody or by an employer of such minor, or in the event there is no guardian or employer then by some other responsible person who is willing to assume the obligation imposed under this Act upon a person signing the application of a minor.

"(b) Any negligence or willful misconduct of a minor under the age of 18 years when driving a motor vehicle upon a highway shall be imputed to the person who has signed the application of such minor for a permit or license, which person shall be jointly and severally liable with such minor for any damages caused by such negligence or willful misconduct (except as otherwise provided in the next succeeding paragraph)."

Section 20 provides as follows:

"(a) The departments upon issuing an operator's or chauffeur's license shall have authority whenever good cause appears to impose restrictions suitable to the licensee's driving ability with respect to the type of or special mechanical control devices required on a motor vehicle which the licensee may operate or such other restrictions applicable to the licensee as the department may determine to be appropriate to assure the safe operation of a motor vehicle by the licensee.

"(b) The department may either issue a special restricted license or may set forth such restrictions upon the usual license form.

"(c) The department may upon receiving satisfactory evidence of any violation of the restrictions of such license suspend or revoke the same but the licensees shall be entitled to a hearing as upon a suspension or revocation under this Act.

"(d) It is a misdemeanor for any person to operate a motor vehicle in any manner in violation of the restrictions imposed in a restricted license issued to him."

Under the regulations, a restricted license could only be issued for daylight driving.

"State of Idaho. Department of Law Enforcement Driver's License Division. Regulation.

"Any operator's license or temporary permit issued to all individuals of the ages of fourteen (14) and Fifteen (15) years, shall be restricted to daylight driving only; Meaning from sunrise to one half hour (½) past sunset, sea level, during any calendar day. Signed B. L. Balderson, Commissioner Department of Law Enforcement."

This question has been passed upon in this court by the Honorable Charles C. Cavanah, in the case of The General Accident, Fire, Life Insurance Corporation Ltd., v. Will W. Redmond et al. (unreported) and the Supreme Court of the United States in the case of United States Fidelity & Guaranty Co. v. Guenther, 281 U.S. 34, at page 37, 50 S.Ct. 165, at page 167, 74 L.Ed. 683, 72 A.L.R. 1064, says: "The plain and evident purpose of the clause was to prevent the Company from being held liable for any accident occurring while by reason of the age of the operator the automobile was being operated in violation of law. To that end liability was excluded when the operator was under 'the age limit fixed by law.' This is not limited to the case where the age limit is fixed by 'a law' a specific phrase frequently limited in a technical sense to a statute, which, to say the least, would have involved doubt as to whether a municipal ordinance was included. On the contrary the clause uses the broad phrase 'fixed by law,' in which the term 'law' is used in a generic sense, as meaning the rule of action or conduct duly prescribed by controlling authority, and having binding legal force."

Dresser was not permitted by the laws of the State of Idaho to drive the car at the time in question. The company provided by its contract of insurance that if the car was so driven they were not to be held liable, and the rule is well established in the Guenther case hereinbefore cited. The company certainly could not be held liable for any accident occurring while defendant Dresser was driving the car.

■■ In discussing the liability of the company no doubt the court should consider Hurtt's position in this controversy. As has been said elsewhere in this opinion Hurtt was a director, and the office manager of the Western Underwriters; this defendant corporation was the owner of the

car. Borresen had the car for a trip to Lewistown, Idaho, on the day preceding the accident, on Western Underwriters' business. Hurtt accompanied Borresen on the trip to be introduced to certain of the stockholders of the corporation who lived at that place, and to assist in making some collections for the Western Underwriters. This was his interest in making the trip; he acted as a representative of the corporation. He entered the car on business of the Western Underwriters; the Western Underwriters were paying the expenses of the trip. Hurtt had a joint interest in making the trip; a greater interest than Borresen, as Borresen's connection with the corporation has been severed. He was making the trip on his vacation time, without pay. In Hurtt's position he had the express and implied right to direct and control the car. It was a joint enterprise. On their return from Lewiston, when Borresen left the car, Hurtt testified: "We were going to take the girls home". Instead of doing that they took a hundred and fifty mile trip to Glenns Ferry, Sandner and Dresser in the front seat, Hurtt and Morrow in the rear seat. Sandner had asked Hurtt's permission before turning the car over to Dresser to drive. Hurtt could not under any circumstance be recognized as a guest in the car. It was still a joint enterprise.

 The third question, Was Borresen insured by the policy?

The contract of insurance requires that Borresen should have some interest in the property. He had no interest at the time the insurance was written (except the naked possession). He had no interest on the date of the accident. True, there was a tentative agreement with one of the officers of the Western Underwriters, this agreement was had at a dinner party,—according to Borresen's testimony. This tentative agreement was made after the execution of the policy and was not completed, and it was agreed that this tentative agreement was cancelled prior to the date of the accident. At the time of the issuance of the policy the only information given to the agent of the plaintiff was that the car was owned by Borresen; plaintiff was never informed, and had no knowledge that Western Underwriters was the owner of the car and that Borresen had no interest in the title. Hurtt for some reason, which does not appear, told the plaintiff that Bor-

resen was the owner of the car. Hurtt was experienced in insurance work of this kind. Records in his possession as office manager of the Western Underwriters showed the ownership of the car to be in the Western Underwriters. The certificate of title, in his possession as office manager, showed the title in the name of the Western Underwriters. There was no record of any action taken by the Board of Directors or placed on the minutes of the Western Underwriters that Borresen had any interest in the car or any option to purchase the car. The policy was delivered to the office of the Western Underwriters. It was accepted with full knowledge of its contents. In accepting it the corporation is presumed to have accepted it with such knowledge and to have adopted as its own, the stipulations therein incorporated.

Under the warranties as hereinbefore recited, item 6, "Is the named insured the sole owner of the automobile except as shown in the mortgage schedule at item 4? Yes." "This policy is issued by the company relying upon the truth of the above warranties." This was the warranty of ownership; no ownership existed.

Construing the policy and viewing all of the evidence before the court, these provisions of the contract of insurance mean nothing and the other stipulations of the policy mean but very little if the plaintiff is to be held liable.

Recognizing again the rule that all of these questions should be construed most favorably to the insured and against the insurer, the court must also bear in mind as stated by Justice Storey in the Carpenter case hereinbefore cited: "The public, too, have an interest in maintaining the validity of these clauses, and giving them full effect and operation. They have a tendency to keep premiums down to the lowest rates, and to uphold institutions of this sort."

So in this case we must look to the contract, in looking to it, and in the light of the testimony in the case, the court must determine that the relief asked for by the plaintiff in accordance with the allegations and prayer of its complaint should be granted.

Attorneys for the plaintiff will prepare the necessary findings, conclusions and orders, serve on opposing counsel and present to the court for signature. This should be done within fifteen days.